**In re TURBOWIND, INC., Debtor.**

**TURBOWIND, INC., Plaintiff,**

v.

**POST STREET MANAGEMENT, INC., Defendant.**

**Bankruptcy No. 84–07716–M11.
Adv. No. C84–0281–LM11.**

United States Bankruptcy Court,
S.D. California.

Sept. 19, 1984.

James W. Dempsey, Charles E. Duff, Jr., Dempsey, Dempsey & Duff, Vista, Cal., for debtor-in-possession.

Stephen Petach, Jones, Hatfield & Penfield, Escondido, Cal., for debtor.

Thomas Henry Coleman, Mark C. Fields, Morgan, Lewis & Bockius, Los Angeles, Cal., for defendant Post Street Management.

Craig E. Dwyer, San Diego, Cal., for Jay Coffee, creditor.

LOUISE DeCARL MALUGEN, Bankruptcy Judge.

I

## BACKGROUND

This matter is before the Court on the debtor Turbowind's motion to reject an ex-

ecutory contract and its motion for a mandatory injunction. The motions were consolidated for hearing for the convenience of all parties.

## II

### FACTS

Turbowind, Inc. ("debtor") is a corporation engaged in the manufacture and installation of electricity-generating wind turbines ("windmill" or "machine"). In order to finance the construction of the machines, each machine was sold to "owners".[1] The purchase agreement provided for the "sale" of a windmill for a price of $600,000, with the buyer usually paying a $150,000 cash down payment and giving the debtor a $450,000 interest-only note. The purchase agreement further provided that electricity generated by each windmill was to be sold to Pacific Gas & Electric Company and, after payment of the debtor's expenses in maintaining the machines, the net income was to be divided with 80% paid to the debtor as interest on the note and 20% paid to each owner. Under the contract, the debtor was obligated to construct, erect and maintain the windmill.

Between 1982 and 1983, the debtor entered into contracts with Verder Associates, Inc. ("Verder") for the manufacture of 60 windmills and their towers. Each windmill consists of a turbine with two 43-foot blades installed atop a 60-foot pole. The first 30 machines completed were transported and erected on land leased by the debtor in Altamont, California. Because of problems with the operation of the nacelles, the machines had to be removed from their poles and returned to Verder for retrofitting.

In October 1983, the debtor informed a meeting of owners that it did not have sufficient funds to complete the retrofitting and reinstallation of the machines and suggested the formation of a committee to raise money to complete the machines. In November 1983, Post Street Management, Inc. ("PSM") was created. PSM's president is Louis Peixotto ("Peixotto"), who owns 50% of PSM's stock and has an interest in at least four of the machines.

On November 2, 1983, PSM and the debtor entered into a Project Completion Agreement ("Agreement"), which provided that PSM, on behalf of owners listed in Exhibit "A" of the Agreement, would obtain additional funds from those owners to pay for the necessary retrofitting and reinstallation of the machines. The Agreement provides that the debtor is to execute a note to each owner for funds advanced by the owner to PSM. The Agreement is ambiguous but appears to provide that the debtor not only must repay each machine owner the full amount of the loan with interest at 13.5% per annum, but also must give each owner a credit against the owner's $450,000 note to the debtor in double the amount of the advance to PSM. Of the 80% of the net production income originally agreed to be paid to the debtor, the Agreement required 70% of that net income to be paid to PSM as a management fee and 30% of the income be paid to the debtor. Additionally, the debtor was obliged to identify the machines and their towers "by fixing or stamping in a permanent manner ... the name of the respective owner."

Although Exhibit "A" to the Agreement lists 27 owners on whose behalf PSM was acting, a letter from Peter Benz (attorney, syndicator and other 50% owner of PSM) dated November 9, 1983, (a week after the execution of the Agreement), describes in detail the Agreement and the anticipated cost of completing the machines, stating, "I have enclosed a contract for your execution if you wish to have Post Street Management proceed on your behalf. A check should be made out to Post Street Management, Inc., in the total amount of $28,850." At one of the hearings on this motion, Benz testified that only six of the 27 owners listed on Exhibit "A" had returned those

---

**1.** This Court makes no determination as to whether these windmills are owned, as a matter of law, by these parties.

contracts, although he claims to have verbal instructions from an undetermined number of other owners.

After the debtor executed the Agreement, D. Wade Hurst, then-president and 100% shareholder of the debtor, together with Benz and Peixotto, went to the Verder plant and marked each of the machines with a crayon-type pen. The next day the parties flew to the Altamont site and marked each of the towers with a crayon-type pen. Verder continued retrofitting the machines and, on March 15, 1984, two retrofitted windmills were installed at the Altamont site. Because of a bearing seizure, the machines operated for a very short time, and once again had to be dismounted and returned to Verder for repair. Certain design modifications were made to those two machines which were ready for testing when the debtor filed its Chapter 11 proceeding on April 20, 1984.

On April 23, 1984, debtor's counsel contacted Peixotto and informed him of the debtor's Chapter 11 filing and its intention to reject the agreement between PSM and the debtor. On April 24, 1984, PSM, through its agents Peixotto and Ray Troxell ("Troxell"), took 24 of the machines from the Verder shop to Troxell's shop in Monteca, California. The machines in Troxell's shop include the two ready for testing and a third which could be tested after minor modifications. Verder retains possession of the remaining 36 machines.

On April 25, 1984, the debtor sought and obtained a temporary restraining order from this Court, enjoining PSM, its officers, directors, agents, and employees, from selling, transferring or otherwise disposing of any of the machines or related parts. By stipulation, the restraining order was extended until a hearing could be held on the preliminary injunction on May 30, 1984. The debtor filed its complaint against PSM seeking mandatory injunctive relief, as well as its motion for preliminary injunction. The debtor also filed its motion to reject executory contract with PSM and both matters were consolidated for purposes of trial.[2]

## III

### ISSUES

The motions in this case raise the following issues:

1. Whether the agreement between the debtor and PSM is an executory contract, which if rejected would benefit the estate, particularly the general unsecured creditors;

2. Did PSM violate the § 362[3] automatic stay?

3. If there was a violation of the stay, is the debtor entitled to a turnover order pursuant to § 105(a) without satisfying the requirements for issuing mandatory injunctions contained in Bankruptcy Rule 7065 (F.R.C.P.65).

2. The consolidation of these two matters was administrative and done for the convenience of the parties and the Court, at the request of the parties, and as an exercise of the Court's discretion to control her own calendar. The matters were not substantively consolidated as contemplated in Bankruptcy Rule 7042 and Federal Rule of Civil Procedure 42(a).

3. Any reference to Code sections is a reference to 11 U.S.C. §§ 101–151326. This Court is aware that on July 10, 1984, Title 11 of the United States Code was substantially amended by the "Bankruptcy Amendments and Federal Judgeship Act Of 1984" ("Act"). Section 553 of the Act provides that the substantive amendments shall become effective in cases filed 90 days *after* the date of the enactment of the Act and is therefore not controlling to the disposi-

tion of this case. However, pursuant to § 122(a), the amendments contained in Title I of the Act entitled "Bankruptcy Jurisdiction And Procedure" are applicable to cases and proceedings pending on the date of enactment. Despite the fact that this Court took this matter under submission prior to the July 10, 1984 enactment date, the Court must apply the law in effect on the date of decision unless Congress expressly directed that the law be prospective only. *Bradley v. School Bd. of the City of Richmond,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974); *Carpenter v. Wabash Ry. Co.,* 309 U.S. 23, 27, 60 S.Ct. 416, 418, 84 L.Ed. 558 (1940); *In re Reynolds,* 726 F.2d 1420, 1422 (9th Cir.1984); *In re Kuehndorf,* 24 B.R. 555, 558 (W.D.Wis.1982).

## IV

## DISCUSSION

■ In light of the jurisdictional amendments contained in the new Act, this Court must first address its power to render a decision in this case. Section 1334(b) of Title 28 as amended, provides that the district court has original (although not exclusive) jurisdiction over all civil proceedings arising in or related to Title 11 cases. By § 157(a) the district court may provide that all proceedings arising in and relating to Title 11 cases be referred to bankruptcy judges in the district. By General Order 312–B entered July 24, 1984, the United States District Court for the Southern District of California referred all cases arising in and related to Title 11 cases to the bankruptcy judges of this District. Accordingly, this Court has jurisdiction over this case.

As was the case under the prior *Emergency Resolution* (which expired on June 27, 1984), § 157(c)(1) provides that a bankruptcy judge may hear and render findings of fact, conclusions of law and a final order only in matters which are determined to be "core" proceedings. Whether the matter is a core or non-core proceeding is to be determined by the bankruptcy judge.[4] Section 157(b)(2) contains a comprehensive, though not exclusive, list of proceedings which are considered core proceedings. This Court finds that a motion to reject an executory contract and a complaint alleging violation of the automatic stay are "matters concerning the administration of the estate" as provided by § 157(b)(2)(A) and are core proceedings in which this Court may make a final determination.

## 1. REJECTION OF PROJECT COMPLETION AGREEMENT.

Section 365(a) provides in pertinent part: "(a) Except as provided in sections 765 and 766 of this Title and subsections (b), (c) and (d) of this section, the trustee, subject to the court's approval, may as-

sume or reject any executory contract or unexpired lease of the debtor."

Section 365(d)(2) additionally provides in pertinent part:

"... (2) In a case under Chapter 9, 11 or 13 of this Title, the trustee may assume or reject an executory contract or unexpired lease of the debtor at any time before the confirmation of a plan...."

These provisions make it clear that the trustee may reject any executory contract prior to the confirmation of the plan. Section 1107(a) provides that a debtor in possession is deemed to have all the rights, other than the right to compensation under § 330, of a trustee.

### A. *The Project Completion Agreement Is An Executory Contract.*

At the outset, PSM argues that the agreement with the debtor is not an executory contract subject to the provisions of § 365. PSM correctly notes that the term "executory contract" is not defined in the Code, but that well-reasoned case authority has adopted the definition put forth by Professor Countryman:

"A contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance will constitute a material breach excusing the performance of the other." *Countryman, Executory Contracts In Bankruptcy Part 1:* 57 Minn. L.Rev. 439, 460 (1973); *In re Select-A-Seat Corp.,* 625 F.2d 290 (9th Cir.1980).

PSM argues that the debtor has fully performed its obligations under the Agreement by stepping aside and letting PSM arrange for the retrofit and reinstallation and by identifying those machines which belong to buyers represented by PSM. Mr. Peixotto testified that the entire burden of performance under the Agreement was on PSM and nothing remained to be done by the debtor.

---

**4.** Post Street Management raised the issue by its Ex Parte Application for Determination of Sta-

tus of Proceedings [sic] which was filed September 6, 1984.

■ The debtor counters that the debtor's obligations under the Agreement were not fulfilled. The Agreement required the debtor to permanently identify machines subject to the Agreement and, although the testimony conflicts on this point, it appears that, at best, only one machine was so identified. Further, the debtor is obligated to maintain the windmills and to pay a percentage of the net income from the electricity sold to PSM in addition to making payments directly to those buyers represented by PSM.

Neither the debtor nor PSM argue that PSM has completed its obligations under the agreement. Of the 24 machines which have been made subject to the agreement, only two and possibly three have been retrofitted. It is equally clear that the debtor's obligations under the Agreement remain unperformed. The fact that the debtor seeks to reject the agreement indicates that it has some post-petition liability under the contract which it is trying to avoid. As testified by Mr. Levene, the debtor's current president, there is a continuing management fee which must be paid to PSM in the amount of 70% of the net income the debtor receives. Additionally, the debtor must make loan payments to those buyers represented by PSM who have advanced funds to complete retrofitting. The debtor seeks to avoid the continuing obligation to make these payments and these debt adjustments by rejection of this executory contract.

### B. Rejection Of The Agreement Is In The Best Interest Of The Estate.

■ As stated by the Supreme Court in *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul and Pacific R.R. Co.*, 318 U.S. 523, 550, 63 S.Ct. 727, 742, 87 L.Ed. 959 (1943), "[t]he question whether a lease should be rejected... is one of business judgment." Virtually all recent bankruptcy court decisions follow the "business judgment" rule as the standard for approval or disapproval of the debtor-in-possession's decision to reject an executory contract. *In re Huang*, 23 B.R. 798, 800–801

(BAP 9th Cir.1982); *In re Hurricane Elcorn Cole Corp.*, 15 B.R. 987, 989 (Bkrtcy. W.D.Ky.1981); *In re Summit Land Co.*, 13 B.R. 310, 314–15 (Bkrtcy.D. Utah 1981). As noted recently by the Appellate Panel in the *Huang* case:

> "We believe the 'business judgment' rule is the standard which controls the court's right to disapprove the trustee's decision to reject an executory contract.
>
>     *    *    *    *    *    *
>
> "What are the criteria which the court and trustee legitimately consider in exercising their 'business judgment'? ... The primary issue is whether rejection would benefit the general unsecured creditors. This may involve a balancing of the interests." *In re Huang*, 23 B.R. at 800–801.

PSM contends that the debtor has alienated buyers as well as manufacturers. It argues that rejection of the Agreement is not in the best interests of the estate, since only PSM can work with these alienated buyers and manufacturers whose input will be necessary to complete the retrofitting and reinstallation.

On behalf of the debtor, Levene argues that the Agreement should be rejected because: (a) It is not cost efficient and there will be a duplication of effort and expense if PSM continues to manage the operations of the 24 windmills while the debtor manages the operations of the remaining 36; (b) Both the debtor and PSM are in disagreement as to management procedures and continuation of the Agreement will exacerbate that acrimony; (c) Given those provisions of the Agreement permitting PSM to receive unlimited advancements from buyers which become loans to the debtor, all due and payable in five years, with interest accruing at 13½%, the potential financial burden on the debtor outweighs any benefits to the estate; (d) The language of the Agreement is ambiguous as to PSM's authority to sell new machines in competition with the debtor; (e) When PSM took 24 of the most complete machines, leaving the debtor with those needing the most work, the debtor's ability to

reorganize without substantial investment of new capital was severely impaired; (f) Under the Agreement, any net income realized by the debtor from the generation and sale of electricity would be reduced from 80% to 30%; (g) There is a significant possibility that the debtor will be liable for taxes on all net income despite its obligation under the Agreement to pay 70% of it to PSM and use the remainder to repay buyers who have advanced funds to PSM.

It is clear that the benefits of rejecting the Project Completion Agreement far outweigh any benefits to the debtor from its continuation. The debtor has met its burden under the liberal "business judgment" standard by demonstrating that there is a reasonable likelihood that the general creditors of the estate will derive substantial or significant benefit from the proposed rejection. Even under the "burdensome" test, PSM has failed to demonstrate that if the Agreement is rejected it would be damaged disproportionately to any benefit derived by the estate. Upon rejection of the Agreement, PSM still retains an action for breach of the Agreement as of immediately before the filing of the petition pursuant to § 365(g)(1) and § 502(g).

2. PSM'S ACQUISITION OF THE 24 MACHINES WAS AN ACT TO OBTAIN POSSESSION OF PROPERTY OF THE ESTATE OR FROM THE ESTATE IN VIOLATION OF THE AUTOMATIC STAY.

██ Subsection 362(a)(3) provides that the filing of a voluntary Chapter 11 petition operates as a stay of "[a]ny act to obtain possession of property of the estate or of property from the estate; ...." The operation of the automatic stay does not depend on the debtor having either a legal or equitable interest in the property, but applies to peroperty merely in the debtor's possession at the time of filing, and remains in effect until and unless the debtor abandons such property or relief from the stay is sought. *See In re Zartun,* 30 B.R. 543, 545 (BAP 9th Cir.1983); *see also, In re Perry,* 29 B.R. 787, 793 (D.Md.1983).

PSM contends that the machines are not listed in the debtor's schedules and absent a showing by the debtor that it has a property interest in the machines, this Court is without jurisdiction to order turnover. Additionally, PSM argues that recitals in the 60 wind turbine purchase agreements show a clear understanding that the machines are owned by the individual owners and not the debtor, and that the debtor is estopped to claim it has any right of ownership. In the alternative, PSM contends that the machines were not taken from the debtor's possession but from the possession of Verder, and there has been no violation of the stay.

██ Contrary to the reasoning of PSM, this Court need not determine whether the debtor has a property interest in the 24 machines. The language of § 362 is clear that mere possession of property is sufficient to invoke the protections of the automatic stay. Here, the debtor was effectively in possession of the 24 machines through its authorized agent, Verder. PSM obtained possession from Verder in violation of the stay. As noted by the Appellate Panel in the *Zartun* case at page 545:

"Any doubt as to what is meant by this paragraph is dispelled by the legislative reports. 'Paragraph (3) stays any act to obtain possession of... property from the estate (property over which the estate has control or possession).'" H.R. No. 95–595, 95th Cong. 1st Sess. 340-2 (1977); S.R. No. 95–989, 95th Cong., 2nd Sess. 49–51 (1978), *U.S. Code Cong. & Admin. News,* pp. 5787, 5836, 6298.

The court in *In re Marta Group, Inc.,* 33 B.R. 634, 641–642 (Bkrtcy.E.D.Penn.1983) addressed a similar argument where a consignor of goods sought to reclaim goods from the debtor without first seeking relief from stay:

"Although Marta [the debtor] has no property interest in these goods, the automatic stay bars Emerson from reclaiming them without leave from the Bankruptcy Court since they are in the debtor's possession.... Section 362(a)(3)

bars creditor action to obtain property *from* the debtor's estate even though the property is not part of the estate. 2 *Collier on Bankruptcy* § 362.04 at 362–31 (15th Ed.1982)."

This debtor exercised sufficient control and possession over these machines to invoke the protections of the stay.

3. UPON A SHOWING THAT THERE HAS BEEN A VIOLATION OF THE AUTOMATIC STAY, THE DEBTOR IS ENTITLED TO A TURNOVER ORDER, AND THERE IS NO NEED TO SATISFY THE REQUIREMENTS NECESSARY FOR THE IMPOSITION OF A MANDATORY INJUNCTION.

■ Once it has been determined by the Court that a creditor has violated the automatic stay of § 362(a), it is necessary to examine the remedies available and the power of the Court to return the parties to the *status quo.* Section 105(a) provides:

"The bankruptcy court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

The above-quoted provision is similar in effect to the ALL WRITS STATUTE, 28 U.S.C. § 1651, and has been cited in stay violation cases as affording the bankruptcy court a basis upon which it may fashion a remedy to return the parties to their pre-violation position. H.R. 95–595, 95th Cong., 1st Sess. 316 (1977); *see, In re Reed,* 11 B.R. 258, 262 (Bkrtcy.D. Utah 1981); *see also, In the Matter of R.S. Pinellas Motel Partnership,* 2 B.R. 113, 118 (Bkrtcy.M.D. Fla.1979).

In the present case, the debtor did not apprise the Court of PSM's contemptuous conduct in the usual way of requesting an order to show cause regarding contempt. Rather, the debtor filed a complaint against PSM seeking an injunction precluding the transfer of the machines and mandating their turnover based upon the § 362(a)(3) violation. Later, the debtor filed its motion

for preliminary injunction and proceeded to make a case according to the requirements of F.R.C.P. 65. Both the complaint and motion alleged that PSM's conduct violated the automatic stay and was subject to this Court's contempt powers. PSM does not contend that it was unaware that the debtor sought its injunction and turnover order on the grounds that PSM violated the stay. However, PSM contends that the debtor has not met the more stringent requirements for the issuance of a mandatory injunction.[5]

While § 105 grants this Court the power to carry out the provisions of the Code, the Appellate Panel in *In re Golden Plan of California,* 36 B.R. 95, 96 (BAP 9th Cir. 1984), recently ruled that where the exercise of that power entails the imposition of an injunction, there must be compliance with the injunction provisions of Bankruptcy Rule 7065 (Federal Rule of Civil Procedure 65). A broad reading of the holding in the *Golden Plan* case would effectively preclude a bankruptcy court's inherent power to address violations of § 362 and insure obedience of its orders in general.

The *Golden Plan* case concerned an adversary complaint brought by a trustee who also sought a restraining order to prohibit the transfer of any personal property pending the outcome of the litigation. The Panel reversed the trial court's ruling that § 105 took priority over and superseded F.R.C.P. 65. Unlike the situation in the present case, there was no violation of the stay addressed by the *Golden Plan* court.

■ Ordinarily, a party seeking an injunction of any type must clearly meet the standards of F.R.C.P. 65. *Glacier Park Foundation v. Watt,* 663 F.2d 882, 884 (9th Cir.1981). However, if property is within the protected categories defined in § 362, an automatic injunction is triggered by the debtor's filing of a petition for relief. *In re Mellor,* 734 F.2d 1396, 1399 (9th Cir.1984); *La Jolla Mortgage Fund v.*

---

5. The debtor has, in fact, demonstrated either "... (1) probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of

hardships tips sharply in the movant's favor...," warranting the imposition of a preliminary mandatory injunction. *Glacier Park Foundation v. Watt,* 663 F.2d 882, 884 (9th Cir.1981).

*Rancho El Cajon Associates,* 18 B.R. 283, 286 (Bkrtcy.S.D.Cal.1982). Therefore, the debtor need not meet the standards for obtaining an injunction contained in F.R. C.P. 65.

 A creditor who wants property in the possession of the debtor is required to seek relief under § 362(d). Where, as here, a creditor violates the stay by taking property from the debtor without seeking relief, it is not proper to make the debtor meet the F.R.C.P. 65 standards to regain it. To hold otherwise would place a burden on the debtor which § 362 intended to alleviate. Further, it would encourage creditors to violate the stay as an alternative to seeking relief under § 362(d).

Having determined that PSM has violated the automatic stay, this Court, in the exercise of her § 105 power, finds that PSM should be ordered to turn over all property taken from the debtor. The property subject to the turnover order is also the subject of the motion for preliminary injunction and the underlying complaint. Any justiciable controversy which may have been presented in either of those two matters has been rendered moot. Thus, there is no present controversy to sustain the motion, and the underlying complaint should be dismissed. *See, Golden v. Zwickler,* 394 U.S. 103, 107–08, 89 S.Ct. 956, 959–60, 22 L.Ed.2d 113 (1969); *State of Nevada ex rel State Bd. of Agriculture v. U.S.,* 699 F.2d 486, 487 (9th Cir.1983); 6A *Moore's Federal Practice,* ¶ 57.13 at 57–121 (2nd Ed.1983).

Finally, PSM makes a procedural argument citing F.R.C.P. 19(a), [B.R. 7019], that a preliminary injunction cannot issue without joinder of each individual owner since such parties are indispensable to this litigation. PSM contends that the section requires joinder of a person who has an interest relating to the subject of an action whose absence may impair or impede her ability to protect that interest. As stated earlier, this Court need not address whether these machines belong to these individual owners or are property of the estate. The issuance of this turnover order is based upon PSM's violation of § 362(a)(3) and merely returns the parties to the previolation *status quo.* The order requiring turnover does not impair either the rights of PSM or any alleged owner to litigate the issue of ownership of these machines. *See, In re Transleisure Corp.,* 41 B.R. 201, 11 B.C.D. 1377, 1379–80 (Bkrtcy. E.D.N.Y. 1984).

This Opinion shall constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052. The debtor shall submit an appropriate order within ten (10) days of the filing of this Opinion.